# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

WILLIAM K. WINKELMEYER, M.D., and
BRENDA WINKELMEYER,

      Plaintiffs,

      v.

DEPUY ORTHOPAEDICS, INC.; DEPUY
PRODUCTS, INC.; DEPUY SYNTHES, INC.;
JOHNSON & JOHNSON, INC.; JOHNSON &
JOHNSON SERVICES, INC.; and JOHNSON
& JOHNSON INTERNATIONAL,

      Defendants.

Case No. 2:13-cv-04058-NKL

## ORDER

Defendants DePuy Orthopaedic, Inc., DePuy Products, Inc., DePuy Synthes, Inc., Johnson

& Johnson, Inc., Johnson & Johnson Services, Inc., and Johnson & Johnson International

(together, "DePuy") move to disqualify the expert designated by plaintiffs William K.

Winkelmeyer, M.D., and Brenda Winkelmeyer, Stephen Li, Ph.D., from providing expert

testimony in this case. Doc. 15. For the reasons discussed below, the motion to disqualify is

denied.

## I.    BACKGROUND[1]

Dr. Li, a polymer chemist, had been one of the scientists at DuPont who invented an

---

[1] In support of its motion, DePuy has submitted the Declaration of an attorney, Kenneth Inskeep, who formerly "had a leadership role in defending the litigation against DePuy and affiliated companies involving the Pinnacle Cup System through the time the consolidated *Aoki* cases were settled." In response, Mr. Winkelmeyer has submitted Dr. Li's affidavit, which states that he does not "recall" Mr. Inskeep's or any other DePuy lawyer's sharing any confidential or proprietary DePuy information or any mental impressions or litigation strategy with him. Insofar as Mr. Inskeep's specific recollections, which include memories refreshed by his notes and other

1

enhanced polyethylene for use as the bearing surface in hip replacements. Dr. Li subsequently was employed in the implant retrieval laboratory of the Hospital for Special Surgery in New York, New York, where (among other things) he studied the performance of components that had been retrieved from patients. Dr. Li also served as lead reviewer on an FDA Advisory Panel that considered the potential down-classification of metal-on-metal devices in August 2001.

In the early 1990s, Mr. Inskeep's law firm, Barnes & Thornburg, engaged Dr. Li on behalf of DePuy as an expert in cases involving various hip devices, including the ACS and Duraloc cup systems as both a consulting and testifying expert. For a period of time thereafter, Dr. Li was one of DePuy's principal outside consulting and testifying experts, "particularly on cases involving polyethylene performance."

When "significant litigation . . . involving DePuy's metal-on-metal ('MoM') hip replacement options" "emerged" in 2010, Mr. Inskeep contacted Dr. Li. Dr. Li then advised Mr. Inskeep that a plaintiff's personal injury firm had approached him to potentially serve as an expert witness in an ASR MoM case against DePuy. Mr. Inskeep responded that, "under the applicable ethical rules, [he] could not consult with him or discuss MoM hip litigation if he had received any confidential information or performed any substantive consulting with a lawyer representing a Plaintiff." Dr. Li "confirm[ed] . . . that he had received no confidential information from the lawyer involved, had performed no substantive work, and had informed the lawyer he was declining the proposed engagement . . . ."

Mr. Inskeep met with Dr. Li on October 27 and 28, 2010 "to discuss the ASR litigation specifically, but also MoM hips more generally, as [Mr. Inskeep] anticipated [DePuy's legal

---

documents, are more precise than those of Dr. Li, the Court credits Mr. Inskeep's statements.

counsel] might also want to use [Dr. Li] as an expert in the litigation involving the DePuy Pinnacle

MoM device." Mr. Inskeep states that "[m]uch of [their] discussion was applicable to both ASR

and Pinnacle devices," but absent from Mr. Inskeep's declaration is any indication that he

communicated to Dr. Li that the consultation would concern MoM Pinnacle devices, the type of

device at issue in this case. Mr. Inskeep supplied Dr. Li with "certain medical and scientific journal

articles [Mr. Inskeep] considered important and key regulatory documents." The subject of their

"extensive discussion and detailed analysis" included "MoM devices generally, including the

DePuy Pinnacle device (not just the ASR), and [Mr. Inskeep's] mental impressions and potential

strategies for defending MoM cases, and his reactions and thoughts on these topics."[2]

Mr. Inskeep states that after this meeting, "it was decided," though it is not clear by whom,

"that the Pinnacle defense team would continue to consult with Dr. Li, and that the ASR defense

team would consult with different experts." There is no suggestion that Dr. Li was included in, or

informed of, this decision.

Mr. Inskeep was the attorney "principally responsible for dealings with Dr. Li on the

---

[2] More specifically, the topics included:

> the performance of "first generation" MoM hips; (b) the development and rationale for reintroducing MoM devices in the 2000s; (c) clinical performance data for ASR MoM devices, (d) specific ASR design issues being raised by Plaintiffs, in the literature and identified by defense lawyers, and how the Pinnacle design was different, (e) wear debris from MoM devices and what role if any it plays in various failure modes; (f) factors to consider in evaluating the performance of any particular patient's MoM device, (g) blood ion levels in MoM patients and their significance from both a product performance and biologic impact perspective, (h) an extensive review of the history of the development of hip replacements and various design and material changes from the 1890s to the present time and the tradeoffs involved in design and material choices, (i) the development over time of lab testing techniques for hip replacement and the associated limitations on what could be studied and known, (j) various FDA positions/actions related to MoM devices, and (i) the state of knowledge when MoM devices were introduced by DePuy regarding the benefits and risks of different bearing surfaces (i.e., various types of polyethylene, metal, and ceramics).

Pinnacle litigation."  Mr. Inskeep describes periodic discussions with Dr. Li in 2011 as "follow[-]up on various issues from our 2010 meeting, but focusing on their applicability to the Pinnacle litigation and other matters specific to the Pinnacle litigation."  In addition, the topics discussed between 2010 and 2013 between Mr. Inskeep and Dr. Li were:

- respective analysis of new developments and journal articles,

- the theories of attack by Plaintiffs,

- refining defense themes and strategies,

- Mr. Inskeep's "mental impressions and other confidential and privileged information about defense strategies, the strengths and weaknesses of each side's respective cases, DePuy's product design and use, and the characteristics and complications associated with polyethylene, metal and ceramic bearing surfaces available in the DePuy Pinnacle cup system,

- Potential defense expert witnesses,

- Plaintiff expert witnesses,

- Strategies for presenting or cross-examining expert witnesses,

- defense strategies involving fretting, corrosion, wear, debris, product testing, design factors impacting corrosion and other issues relating to the Pinnacle cup system,

- the defense of Pinnacle MoM and the larger class of MoM devices, including its performance and use as compared to polyethylene and cross-linked polyethylene, metal debris versus polyethylene debris, and use and interpretation of clinical data sources,

- defensive litigation strategies to respond to the evolving scientific and medical literature regarding MoM devices,

- evaluation of likely Plaintiff experts and expert opinions that would be critical of metal-on-metal,

- and lines of attack against Plaintiffs' allegations and case themes.

In April 2011, Mr. Inskeep sent Dr. Li "materials, including x-rays, on a specific Pinnacle case for which we sought his analysis."

Mr. Inskeep acknowledges that he and Dr. Li "did not speak frequently" from 2013 through

4

2015. During that period, however, Dr. Li "at times transmitted literature or shared insights specifically relating to MoM issues relevant to the Pinnacle litigation."

In August 2015, Plaintiffs disclosed that Al Burstein, Ph.D., who was Dr. Li's friend and business partner, would be one of their testifying experts in a "bellwether trial." Mr. Inskeep, aware of the relationship between Dr. Li and Dr. Burstein, says he asked Dr. Li "if he would be willing to review and critique Dr. Burstein's report to continue to assist [him] in defending the Pinnacle litigation." Dr. Li communicated to Mr. Inskeep "that given his long personal, professional and financial relationships with Dr. Burstein, he simply was not comfortable sharing information about Dr. Burstein, or critiquing him or his report." Mr. Inskeep states, "Dr. Li assured me that he would not discuss the Pinnacle litigation or other matters on which he had consulted with us on behalf of Defendants with Dr. Burstein, and that he did not think Dr. Burstein was even aware of his consultation with DePuy in the Pinnacle litigation." Mr. Inskeep then "concluded that . . . we should suspend consulting with Dr. Li in the Pinnacle litigation until such time as Dr. Burstein was no longer involved."

While Mr. Inskeep does not mention whether Dr. Li was ever formally retained, he specifies that "[n]either Dr. Li nor [he] formally terminated his consultancy for Defendants . . ." Dr. Li states unequivocally that neither DePuy nor Mr. Inskeep presented him with an engagement or nondisclosure agreement in connection with DePuy Pinnacle hips.

Mr. Inskeep states that it was his understanding that Dr. Li "continued to be available to consult as an expert in Pinnacle or other matters provided Dr. Burstein was not involved as an opposing expert." Still, in 2016, DePuy, through Mr. Inskeep's law firm, subsequently formally subpoenaed Dr. Li to testify in an intellectual property case.

DePuy "continued to use many of the defenses and arguments Dr. Li had assisted [counsel]

in developing even after Dr. Burstein became involved in the litigation." Mr. Inskeep states that "nearly all of the points included in Dr. Li's key points summary and much of the detail in the balance of his report" for another plaintiff in the Pinnacle litigation are "associated with" the "defense themes and evidence" which Mr. Inskeep and Dr. Li "collaborated . . . on developing . . . ." Specifically, Mr. Inskeep cites discussion of "the history of metal-on-metal devices in the marketplace, the 510(k) clearance and regulatory history of Pinnacle and other metal-on-metal devices, metal-on-metal testing, performance and wear issues, the clinical performance of DePuy's metal-on-metal and polyethylene components, the marketing and sales of Pinnacle liners, DePuy's stem/head taper junction and corrosion topics, and the importance of head size related to dislocation and related design issues." Thus, Mr. Inskeep states, "Dr. Li had already received, contributed to, and helped formulate the defense positions and strategies that relate to the very points and opinions he now renders for Plaintiffs in this litigation."

Dr. Li received compensation for 47 hours of work amounting to $23,500 in connection with metal-on-metal Pinnacles cases.

## II.    DISCUSSION

"'Federal district courts have the inherent power to disqualify experts.'" *Owen v. Gen. Motors Corp.*, No. 06-4067-CV-C-NKL, 2007 WL 1101194, at *4 (W.D. Mo. Apr. 12, 2007) (quoting, *inter alia*, *Koch Refining Co. v. Boudreaux MV,* 85 F.3d 1178, 1181 (5th Cir.1996)). Indeed, the Court has a "'duty to ensure confidence in the fairness and integrity of the judicial process.'" *Owen*, 2007 WL 1101194, at *4 (quoting *United States v. NHC Health Care Corp.*, 150 F.Supp.2d 1013, 1013 (W.D.Mo.2001)).

If an expert is retained by one party to a suit and then switches sides during the litigation, the conflict of interest is so obvious that disqualification must follow. *See Koch,* 85 F.3d at 1181.

However, "[d]isqualification under the bright-line rule appears to be warranted only when it is undisputed that the expert received relevant confidential information" *Owen*, 2007 WL 1101194, at *4 (citing *Wang Lab'ys, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991); *Theriot v. Parish of Jefferson*, No. 95-2453, 1996 WL 392149, at *2 (E.D. La. July 8, 1996); *Freight Tracking Techs., LLC v. Va. Int'l Gateway, Co.*, No. 2:13-708, 2015 WL 12602453, at *3 n.1 (E.D. Va. Feb. 11, 2015)).

When the conflict is less obvious, courts employ a more nuanced, two-factor test, determining: "(1) whether it was objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed, and (2) whether any confidential or privileged information was disclosed by the first party to the expert." *Koch,* 85 F.3d at 1181*, Owen*, 2007 WL 1101194, at *4. Only if both questions are answered in the affirmative is the Court to disqualify the witness, "and the party seeking disqualification bears the burden on both elements." *Id.* This is because "disqualification is a drastic measure" and should be imposed only "when absolutely necessary." *Id.*, *United States v. Salamanca,* 244 F.Supp.2d 1023, 1025 (D.S.D. 2003).

### A. Whether It Was Objectively Reasonable for DePuy to Conclude that a Confidential Relationship Existed

In determining whether it was objectively reasonable for the movant to conclude that a confidential relationship existed, courts have considered "whether: (1) the relationship between the expert and the adverse party was long-standing and involved frequent contacts; (2) the adverse party directed or funded the formation of an opinion by the expert; (3) the expert and adverse party entered into a formal confidentiality agreement; (4) the expert was retained by the adverse party for the purpose of assisting in the litigation; (5) a fee was paid to the expert by the adverse party;

7

Case 2:13-cv-04058-NKL   Document 28   Filed 03/30/23   Page 7 of 17

and (6) the expert derived specific ideas about the litigation from work done under the direction of the adverse party." *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2014 WL 6960396, at \*7 (S.D.W. Va. Dec. 8, 2014) (citing cases).

### 1. Whether DePuy Retained Dr. Li as an Expert in the Pinnacle Litigation

It is notable that while Mr. Inskeep specifically states that "[n]either Dr. Li nor [he] formally terminated his consultancy for Defendants," Mr. Inskeep does not mention when, whether, or how any consultancy purportedly began. Nothing in Mr. Inskeep's declaration suggests that he or his colleagues ever engaged Dr. Li in connection with Pinnacle litigation. This is in contrast with DePuy's engagement of Dr. Li in the early 1990s "as an expert in cases involving various hip devices, including the ACS and Duraloc cup systems as both a consulting and testifying expert." The only express statements concerning engagement in connection with Pinnacle litigation are from Dr. Li, who unequivocally states that neither DePuy nor Mr. Inskeep presented him with an engagement agreement in connection with DePuy Pinnacle hips.

### 2. Whether DePuy and Dr. Li Entered into a Formal Confidentiality Agreement

Here, as in *Owen*, Defendant has pointed to no agreement requiring Dr. Li to maintain the confidentiality of the materials it purportedly divulged to him. *See Owen*, 2007 WL 1101194, at \*4 ("Had GM expected its information to be confidential, it would have [those to whom it divulged the purportedly confidential information] to execute a confidentiality agreement, but GM has not shown any such agreement was required."). Indeed, Dr. Li states expressly that neither DePuy nor Mr. Inskeep provided him with a nondisclosure agreement in connection with DePuy Pinnacle hips.

8

### 3. Length of Relationship and Frequency of Contacts

Here, the relationship between DePuy and Dr. Li was long-standing, but its focus largely was on issues unrelated to the Pinnacle metal-on-metal hips at issue in this litigation, and the contacts concerning Pinnacle metal-on-metal hip-related issues apparently were sparse.

DePuy contacted Dr. Li in 2010 when "significant litigation . . . involving DePuy's metal-on-metal ('MoM') hip replacement options" "emerged" in 2010. Mr. Inskeep met with Dr. Li on October 27 and 28, 2010, over dinner and drinks, "to discuss the ASR litigation, specifically," though they also discussed metal-on-metal hips generally. Mr. Inskeep "anticipated [DePuy's legal counsel] might also want to use [Dr. Li] as an expert in the litigation involving the DePuy Pinnacle MoM device," but there is no indication that the attorneys actually intended to use Dr. Li for that purpose or, more importantly, that they communicated any such intent to Dr. Li. While Mr. Inskeep states that he shared "mental impressions and potential strategies for defending MoM cases" with Dr. Li, he does not suggest that this confidential information pertained to Pinnacle, rather than ASR, cases. DePuy's "generalized and vague" assertions are not sufficient to trigger disqualification. *Novartis AG v. Apotex Inc.,* No. 09–5614, 2011 WL 691594, at \*4 (D.N.J. Jan. 24, 2011) (finding that "generalized and vague allegation that the expert knew 'mental impressions and trial strategies' did not satisfy movant's burden).

Mr. Inskeep's list of specific topics discussed only obliquely references Pinnacle, and that too only to highlight how the Pinnacle design was different from the "ASR design issues being raised by Plaintiffs . . . ." Nothing in Mr. Inskeep's description of the meetings suggests that Dr. Li would or should have understood that DePuy was consulting him with respect to the Pinnacle metal-on-metal hip litigation. Indeed, it was only after this meeting that, according to Mr. Inskeep, "it was decided that the Pinnacle defense team would continue to consult with Dr. Li, and that the

9

ASR defense team would consult with different experts." Even then, there is no indication that Dr. Li was included in or informed of the Pinnacle defense team's decision.

Subsequently, Mr. Inskeep, who was the attorney "principally responsible for dealings with Dr. Li on the Pinnacle litigation," had "follow[-]up" discussions with Dr. Li "on various issues from [the] 2010 meeting, but focusing on their applicability to the Pinnacle litigation and other matters specific to the Pinnacle litigation." Mr. Inskeep mentions three topics related to Pinnacle: "Mr. Inskeep's "mental impressions and other confidential and privileged information about . . . the characteristics and complications associated with polyethylene, metal and ceramic bearing surfaces available in the DePuy Pinnacle cup system," "defense strategies involving fretting, corrosion, wear, debris, product testing, design factors impacting corrosion and other issues relating to the Pinnacle cup system, and the defense of Pinnacle MoM and the larger class of MoM devices, including its performance and use as compared to polyethylene and cross-linked polyethylene, metal debris versus polyethylene debris, and use and interpretation of clinical data sources . . . ." But even these few specific subjects—none of which appear to concern only Pinnacle metal-on-metal devices—do not suggest that Dr. Li knew or should have known that DePuy understood him to be consulting exclusively with it regarding Pinnacle metal-on-metal litigation. These descriptions thus are insufficient to establish that it was reasonable for DePuy to conclude that Dr. Li was its consulting expert. *See Maxus Metro., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 20-CV-0095-FJG, 2022 WL 2826013, at *6 (W.D. Mo. Mar. 21, 2022) (denying motion to disqualify where expert did not exclusively work for defendant and, though expert had worked on defendant's matters in the past, none of those matters related to the case before the court).

The only decidedly confidential information connected with Pinnacle litigation that DePuy

shared with Dr. Li were "materials, including x-rays, on a specific Pinnacle case," provided by Mr. Inskeep in April 2011, more than a decade ago and years before this case was initiated.[3] Mr. Inskeep does not specify whether that Pinnacle case was a hip implant case or even a metal-on-metal one, and more importantly, neither he nor DePuy's current counsel suggests how any such confidential material influenced or could have influenced Dr. Li's opinions in this case.

From 2013 through August 2015, at which point Dr. Li specifically stated that he would not consult with DePuy on Pinnacle metal-on-metal litigation, Dr. Li sent literature or insights relating to metal-on-metal issues that Mr. Inskeep states were "relevant to the Pinnacle litigation"—but nothing in the Inskeep Declaration indicates that Dr. Li was sending the material because *he* thought them relevant to the Pinnacle litigation.

The contacts between DePuy and Dr. Li apparently ended more than seven years ago, in August 2015, when DePuy asked Dr. Li if he would "review and critique" the report of one of his friends and longtime colleagues in connection with the Pinnacle litigation and Dr. Li declined. Dr. Li's refusal to review and critique his colleague's report itself undercuts DePuy's claim that he was its consulting expert for Pinnacle metal-on-metal litigation.

#### 4. Whether DePuy Directed or Funded the Formation of an Opinion by Dr. Li

DePuy does not suggest that it funded or directed the formation of an opinion by Dr. Li regarding Pinnacle metal-on-metal issues.

#### 5. Whether DePuy Paid Dr. Li a Fee

DePuy compensated Dr. Li approximately $23,500 for a total of 47 hours over an

---

[3] This case was filed in the North District of Texas on March 6, 2013. *See Winkelmeyer v. DePuy Orthopedics, Inc.*, N.D. Tex. No. 13-1172.

11

unspecified period of time for what Mr. Inskeep describes as "expert services relating to metal-on-metal Pinnacle cases." However, Mr. Inskeep's description does not indicate that Dr. Li knew or should have known that he was acting as a consultant for DePuy regarding Pinnacle metal-on-metal cases specifically.

### 6. Whether Dr. Li Derived Specific Ideas About the Litigation from Work Done Under DePuy's Direction

DePuy has not suggested that Dr. Li derived any specific ideas about this litigation from work he did under the direction of, or in consultation with, DePuy. Although DePuy argues that Dr. Li's expert opinions in this case are "associated with" the "defense themes and evidence" that Mr. Inskeep and Dr. Li "collaborated . . . on developing," it does not suggest that Dr. Li used confidential DePuy information or insights to come up with the opinions he has offered in this case. *See Paul By & Through Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 280 (S.D. Ohio 1988) ("To the extent that Dr. Goldsmith may now have given the same advice to plaintiffs, there is nothing unfair in permitting him to do so. He did not develop any expertise in the area of testing baseball helmets, nor derive any of those specific ideas, from work done under [defendant's] direction or using its funds. Dr. Goldsmith appears neither to have made use of, nor to be in possession of, any information which could be classified as a trade secret or deserving of protection on the same type of theory."). If DePuy truly was concerned that Dr. Li had used its confidential and proprietary information to form opinions in support of the Winkelmeyers' case, presumably it would have said so plainly.

\*　　\*　　\*

In short, although Mr. Inskeep's declaration indicates that he and his colleagues used Dr. Li's insights to formulate their own strategies with respect to Pinnacle metal-on-metal litigation,

12

the declaration does not establish that it was reasonable for them to conclude that a confidential relationship existed between DePuy or its attorneys and Dr. Li. Indeed, it is not even clear that DePuy believed it had a confidential relationship with Dr. Li in connection with Pinnacle metal-on-metal litigation. To the contrary, Mr. Inskeep's Declaration indicates that there was no formal understanding between DePuy or its lawyers on one hand and Dr. Li on the other concerning his exclusively or confidentially consulting regarding Pinnacle metal-on-metal litigation. The relationship, though longstanding, consisted of only limited contacts over a period of several years and effectively terminated nearly eight years ago. There is no suggestion that Dr. Li based his opinions in this case on any confidential material that DePuy provided to him. *Cf. C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 6960396, at \*\*10–11 (finding objectively reasonable expectation of a confidential relationship where defendant and expert engaged in multiple face-to-face meetings, lengthy telephone conversations, and email exchanges over four years, expert appeared for deposition testimony and testified at one trial, expert provided formal expert opinions on the subject of the litigation, defendant sent the expert two retention letters although neither was signed, and evidence indicated that the expert developed specific ideas regarding the litigation as a result of the work he performed for defendant). DePuy has failed to proffer evidence sufficient to meet the first prong of the test for expert disqualification.

### B. Whether DePuy Disclosed Any Confidential or Privileged Information to Dr. Li

DePuy has not stated with any specificity what confidential material relevant to this case it provided to Dr. Li.[4] *See In re: Incretin-Based Therapies Prod. Liab. Litig.*, 721 F. App'x 580, 584

---

[4] As mentioned above, the only confidential material specifically identified, x-rays for a different plaintiff from 2011, is not alleged to be relevant to this case. It is not even clear that the x-rays concerned hip or metal-on-metal implants.

(9th Cir. 2017) (vacating order partially disqualifying expert where "defendants did not submit testimony or a declaration of anyone . . . who could attest to whether or how any information provided to Dr. Fleming was relevant to the current litigation, and Dr. Fleming averred that in reaching his opinions and preparing his report for this litigation, he did not rely on any information, confidential or otherwise, that he obtained from his consulting relationship with Novo").  Nor has DePuy pointed out with specificity what, if any, confidential DePuy material formed the basis of Dr. Li's expert opinions in this case.  *See In re Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6603467, at \*4 (D. Ariz. Dec. 21, 2017) (finding that defendants failed to meet their burden on motion for disqualification where "aside from providing very general descriptions, Defendants ma[d]e no effort to identify the confidential information [the expert] received or the parts of his expert report that are based on [defendant's] confidences"); *see also Incretin-Based Therapies*, 721 F. App'x  at 584 (holding that party seeking disqualification bears "burden of showing *specific* and *unambiguous* disclosures" (emphasis in original, quotation marks and citation omitted)).

### C.  Whether DePuy Has Met Its Burden Under the Two-Part Test

Both parts of the two-part test must be satisfied for expert disqualification.  DePuy, however, has satisfied neither prong of the test.  Disqualification therefore is inappropriate.

### D.  Public Policy Considerations

Public policy and equitable considerations also support the Court's conclusion.  *See C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 6960396, at \*7  (stating that, "[b]efore making a final decision, the court should also take into account the principle of basic fairness, as well as competing policy considerations," noting the court's interests in "preventing conflicts of interest and in maintaining judicial integrity" and "maintaining accessibility to experts with

14

specialized knowledge and encouraging experts to pursue their professions" (citing *Novartis AG,* 2011 WL 691594, at *1; *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660, 667–68 (S.D.W. Va. 2008)).

As the Court has previously recognized, "[p]ublic policy is . . . served by permitting academics to freely circulate their research to the public," especially "where an issue of public safety is concerned." *Owen*, 2007 WL 1101194, at *5. The Court is particularly solicitous of the expert's freedom in this case because of the concern, which other courts have noted, that not exercising the power of disqualification "sparingly" could encourage unscrupulous parties to consult with experts they know to have views that could harm them in litigation with the sole goal of preventing them from airing those views. *In re Bard IVC Filters Prod. Liab. Litig.*, 2017 WL 6603467, at **3–5 ("Cases granting disqualification are rare because courts are generally reluctant to disqualify expert witnesses, especially those . . . who possess useful specialized knowledge." (citing Rhodes, 558 F. Supp. 2d at 664)).

Dr. Li has been a vocal critic of metal-on-metal hips since 2001. Doc. 16-1 (Dr. Li Affidavit) ¶ 4. In public FDA advisory panel meetings in 2001, he opposed the down-classification of safety requirements for metal-on-metal total hip implants because of "safety concerns." *Id.*, ¶¶ 5–6. Not only did DePuy know of Dr. Li's position regarding metal-on-metal hip implants, but in fact they sought him out because of it. *See* Inskeep Declaration ¶ 6 ("As a result of our past and ongoing working relationship, and given that Dr. Li had served as lead reviewer on an FDA Advisory Panel that had considered the potential down-classification of metal-on-metal devices in August 2001, when significant litigation emerged in 2010 involving DePuy's metal-on-metal ("MoM") hip replacement options, I contacted Dr. Li to see if he was willing and available to consult with DePuy.").

The fact that DePuy knew that Dr. Li was a critic of metal-on-metal hip implants and that he had been approached to act as a consultant on behalf of some plaintiffs' attorneys, yet apparently did not ask Dr. Li to sign an engagement agreement, a non-disclosure agreement, or any other document clarifying that their relationship with regard to Pinnacle metal-on-metal devices would be exclusive and confidential suggests that DePuy knew that Dr. Li would not agree to an exclusive consulting arrangement or that DePuy did not want a formal consulting arrangement with Dr. Li. *See Wang Lab'ys*, 762 F. Supp. at 1248 ("Lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended.  Fairness requires this."); *Eng. Feedlot, Inc. v. Norden Lab'ys, Inc.*, 833 F. Supp. 1498, 1505 (D. Colo. 1993) ("First, a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing.  The writing should define clearly the consultant's confidentiality obligation.  If a consultant does not want to be bound by such confidentiality requirement, he should decline the engagement." (citing *Wang Lab'ys,* 762 F. Supp. at 1250)).  Denying the motion for disqualification under the circumstances presented here will encourage clear communication and discourage the kinds of gamesmanship that attorneys might otherwise wish to deploy to prevent their opponents from securing the most helpful testimony available.  *See Eng. Feedlot*, 833 F. Supp. at 1505 ("Courts have also expressed concern that if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party.").

**III. CONCLUSION**

For the reasons discussed above, Defendants' motion to disqualify Dr. Li (Doc. 15) is

DENIED.


Dated: <u>March 30, 2023</u>
Jefferson City, Missouri

<u>s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge